**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| WILLIAM WIMBLEY, an individual; and ANA ROSA IGLESIAS, an individual, on behalf of themselves and others similarly situated, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>H&R,BLOCK, INC. and its affiliates and subsidiaries H&R BLOCK SERVICES, INC., HRB TAX GROUP, INC., H&R BLOCK ENTERPRISES, INC., and H&R BLOCK EASTERN ENTERPRISES, INC. Missouri corporations,<br><br>Defendants. ) | Case No:<br><br>Class Action Complaint |

**PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT**

COME NOW, Plaintiffs William Wimbley and Ana Rosa Iglesias (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, filing Plaintiffs' Original Class Action Complaint against Defendants H&R Block, Inc. and its affiliates and subsidiaries H&R Block Services, Inc., HRB Tax Group, Inc., H&R Block Enterprises, Inc. and H&R Block Eastern Enterprises, Inc. (collectively, "Defendant" or "H&R Block"). Plaintiffs seek certification of their claims against Defendant as a class action. Plaintiffs allege, based on personal knowledge as to Defendant's action and upon information and belief as to all other matters, as follows:

1

## INTRODUCTION

1. Defendant, a tax preparation company, has for years been engaging in a pervasive scheme to deceptively market and sell to its customers short-term, extremely high-interest loans backed by a security interest in a customer's anticipated tax refund.

2. In short, Defendant (for a period of 8 to 15 days) defers a customer's payment of Defendant's tax preparation fee for an additional $29.95 fee, but fails to properly construe the fee for what it is: a finance charge. Thus, consumers are not properly provided information as to the actual annual percentage rates on these loans, which often run into the hundreds of percent.

3. Plaintiffs were but two of Defendant's many victims in the state, and accordingly complain against Defendant on behalf of themselves and all other Floridians similarly situated for Defendant's wanton and willful violations of state laws regarding deceptive and unfair trade practices and usury.

## PARTIES

4. Plaintiff William Wimbley is a Florida citizen residing at 1919 NW 96th Street, Miami, Florida in the Southern District of Florida. Mr. Wimbley had his taxes prepared at an office of Defendant located at 693-689 NE 125th Street, North Miami, Florida in the Southern District of Florida. Defendant facilitated Refund Anticipation Loans and/or Refund Anticipation Checks for Mr. Wimbley during the class period.

5. Plaintiff Ana Rosa Iglesias is a Florida citizen residing at 1150 SW 129th Avenue, Miami, Florida in the Southern District of Florida. Ms. Iglesias had her taxes prepared at an office of Defendant located at 17155 Pines Boulevard, Pembroke Pines, Florida in the Southern

District of Florida. Defendant facilitated Refund Anticipation Loans and/or Refund Anticipation Checks for Ms. Iglesias during the class period.

6.  Defendant, H&R Block, Inc., is a Missouri corporation founded in 1955 and listed on the New York Stock Exchange. Operating through various subsidiaries, including H&R Block Services, Inc., HRB Tax Group, Inc., H&R Block Enterprises, Inc., and H&R Block Eastern Enterprises, Inc., H&R Block provides tax, banking and business consulting services. H&R Block's tax and related services constitute the majority of the company's business and revenues. According to H&R Block's 2011 Annual 10-K, $2.9 billion of the company's $3.7 billion in revenue for fiscal year 2011 was derived from tax services.[1] According to H&R Block's website, it prepares 1 in every 7 U.S. tax returns. For the 2011 fiscal year H&R Block prepared 21.4 million tax returns in the U.S., representing 16.4% of the total number of estimated returns received by the Internal Revenue Service. As of April 20, 2011, H&R Block operated 6,493 company-owned stores and 4,575 franchise offices. H&R Block's workforce includes approximately 7,900 regular full-time employees, with its numbers growing to over 107,000 when you include tax season employees.

7.  Defendant, H&R Block's principal place of business is located at One H&R Block Way, Kansas City, Missouri 64105, and can be served through its registered agent CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105.

## JURISDICTION AND VENUE

8.  This Court has jurisdiction over Defendant since at all relevant times Defendant has regularly and systematically transacted business within the State of Florida as a provider of

---

[1] 77.2% of consolidated revenues from continuing operations for fiscal year 2011, 76.8% for 2010 and 76.7% for 2009 were derived from H&R Block's tax services division.

tax return preparation services and other services. Defendant derives substantial revenue from Florida residents.

9. This Court has subject matter jurisdiction over this class action under the Class Action Fairness Act ("CAFA") because there are more than one-hundred class members, all of the members of the class are citizens of a state (Florida) different from that of Defendant, and the aggregate of class members' claims is more than $5 million. 28 U.S.C. § 1332(d).

10. Venue is proper in this Court because the tax preparation services and loan marketing and facilitation giving rise to Plaintiffs' claims occurred in this District. 28 U.S.C. § 1391(b)(2). Venue is also proper in this Court because the Defendant has numerous offices in this District. 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

### Defendant Aggressively Markets Triple-Digit Interest Assisted Refund Products

11. Defendant is a professional tax preparation service that assists consumers with submitting their income tax returns in exchange for a tax preparation fee. Defendant provides tax preparation services through more than 10,000 offices in the United States, with hundreds of offices in Florida. In 2010, Defendant prepared approximately 20 million returns in the United States.

12. In addition to tax preparation services, Defendant aggressively markets products known as Refund Anticipation Loans ("RAL") and Refund Anticipation Checks ("RAC") (collectively, "Refund Products"). Both RALs and RACs are short-term extensions of credit (from Defendant and its banking entity partners) that are secured and repaid directly from the consumer's tax return.

13. Refund Products allow taxpayers to defer the payment of Defendant's tax preparation fee until the actual tax refund is issued by the Internal Revenue Service ("IRS"). In exchange for this loan, consumers are charged a Refund Account Fee and, in the case of a RAL, are charged additional interest.

14. The deferral of tax preparation fees (which for Defendant average $187)[2] are extensions of credit under the Truth in Lending Act, 15 U.S.C. § 1605, and Regulation Z, 12 C.F.R. § 226.4. The average term on the Refund Products is one to two weeks, the length of time it takes for the bank to receive a refund from the IRS.[3]

15. In exchange for this short-term extension of credit, Defendant charges interest in the form of a Refund Account Fee, typically $29.95 for federal returns[4] and an additional $13 for state returns. These Refund Account Fees are finance charges as contemplated by the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* Defendant receives a portion of the Refund Account Fees and/or owns an interest in the underlying loans to its customers.

16. Refund Products thus include exorbitant finance charges that, when properly calculated in accordance with the TILA, often exceed an annual percentage rate (APR) of 100 percent. Such predatory interest and fees provide little to no value to consumers.

17. The Department of Treasury has determined that RAL and RAC usage is highly concentrated in poor and minority communities.[5] Across the U.S. just 20% of all communities account for nearly 70% of all RALs and RACs.[6] Defendant and other tax preparers target these

---

[2] Characteristics of User of Refund Anticipation Loans and Refund Anticipation Checks, Depart of Treasury, 2010, at 4 (hereafter "Treasury Report"),
[3] *Id.*
[4] The fee was raised from $29.95 to $32.95 for the 2011 tax year.
[5] *Id.* at 1, .
[6] *Id*. at 17-20.

high-interest rate loans to minorities and the working poor, particularly those who receive the Earned Income Tax Credit ("EITC"). The median adjusted gross income among RAL consumers is $19,768.[7] In 2008, although only 17% of tax filers received the EITC, EITC claimants comprised 64% of RAL consumers. Viewed another way, 33% of EITC claimants purchased a RAL, compared to only 3% of non-EITC claimants.[8]

18. Defendant aggressively markets RALs and RACs to its customers for whom it provides tax preparation services, as these predatory bank products are a critical part of its business model.

19. This is not mere coincidence. Defendant aggressively markets its Refund Products to the working poor so that a significant portion of the EITC goes to Defendant rather than the intended beneficiaries. Fees from these predatory bank products account for a significant portion of Defendant's revenue.

## Defendant's Illegal Conduct

20. For the 2007 to 2009 tax years, Defendant facilitated Refund Products through an arrangement with HSBC Bank ("HSBC"), a federally chartered bank based in Virginia.

21. When in late 2010 HSBC decided not to renew its partnership with Defendant, Defendant partnered with H&R Block Bank, a federally chartered bank, though Defendant had a 50% interest in the loans. Defendant announced it was discontinuing RAL loans starting in the 2010 tax year, but continues to offer RACs.

22. At all relevant times, Defendant marketed and facilitated the "bank options" to its customers (RALs and RACs), therein deriving substantial revenue.

---

[7] *Id*. at 16.
[8] *Id*. at 13.

**RACs**

23. During the Class period, Defendant facilitated RACs to its tax preparation customers, following common practices and procedures and using uniform forms, applications and disclosures as described below. RACs entail the establishment of a "Refund Deposit Account" at HSBC (and later at H&R Block Bank).

24. The Refund Deposit Account is a non-interest-bearing account established for the sole purpose of receiving the consumer's federal and/or state tax refund and disbursing those funds in a limited manner controlled by HSBC. The consumer cannot make any other deposits to this dummy account or direct any other withdrawals. When the consumer's tax refund is deposited into the account, HSBC first disburses the funds to pay, among other things:

   a. "Refund Account Fees" to itself, some of which also are received by Defendant, typically $29.95" (and an additional $13 if a state tax refund is directed to the Refund Deposit Account);

   b. Any and all debts due to Defendant to pay for tax preparation services; and

   c. Any and all other debts to HSBC including, for example, debts related to bank products sold to the consumer in previous tax years.

25. Any remaining funds are disbursed to the consumer either by check, by direct deposit to the consumer's personal bank account, or by a prepaid card option (called the H&R Block Emerald Card).

26. RACs are bank products of little to no value at an exorbitant finance charge. Named plaintiff William Wimbley's experience for the 2009 tax year is exemplary. Mr. Wimbley had his 2009 taxes prepared at an H&R Block location on February 10, 2010. H&R

7

Block's tax preparation fee for these services was $154. He did not pay the fee at the time, but paid a $29.95 Refund Account Fee so that his tax refund could be direct deposited into a one-transaction dummy account (Deposit Account) at HSBC, from which HSBC directly deposited money into Plaintiff Wimbley's personal checking account.

27. Defendant estimated that Mr. Wimbley's direct deposit would be available in approximately 8 to 15 days. At no cost and much more efficiently, Defendant could have simply completed Mr. Wimbley's e-file so that his tax refund was direct deposited into his personal account. The only "benefit" Mr. Wimbley received from this Rube Goldberg transaction was deferral of payment of the tax preparation fees for 8 to 15 days – a "benefit" for which he paid an exorbitant finance charge. To defer payment of $154 in tax preparation fees for 8 to 15 days, Mr. Wimbley paid an exorbitant finance charge of $29.95.

28. RACs are encompassed by RALs, as they are extensions of credit by Defendant of the tax preparation fee, which would otherwise be due at the time services are provided. Defendant grants deferral of payment for approximately 8 to 15 days (the time period needed to receive the tax refund)[9]. Defendant provides no disclosure of the **triple-digit** interest rate or finance charge for the Refund Products in violation of TILA and the FDUPTA. *See, e.g.*, U.S. F.D.I.C. Amended Notice of Charges for an Order to Cease and Desist, *In the Matter of Republic Bank & Trust Company, Louisville Kentucky*, dated May 3, 2011 at ¶ 34 ("By failing to disclose to taxpayers in the Assisted Refund transactions that the TRAF [Tax Refund Administration Fees] are finance charges for deferral of the tax preparation fees owed, the EROs [such as

---

[9] Defendant's RAC application notes that the IRS normally makes an electronic deposit of a tax filer's refund in 12 days after electronic filing, so Defendant knows that its customers will rarely if ever have to pay out-of-pocket for tax preparation fees.

8

Defendant] have violated the written disclosure requirements under TILA on a nationwide basis in each Assisted Refund transaction").

### RALs

29. RALs have consistently been among the Defendant's most popular and profitable Refund Products. In 2008, H&R Block had 3.85 million RAL customers, followed by 2.95 million in 2009 and 3.4 million in 2010.[10] Ever since fiscal year 2006, Defendant has had an agreement with HSBC allowing it to purchase a 49.999999% interest in all RALs it facilitates. Defendant's RAL participation revenue was $190.2 million, $139.8 million and $146.2 million for fiscal years 2008, 2009 and 2010 respectively.

30. During the Class period, Defendant facilitated HSBC RALs to its tax preparation customers, following common practices and procedures and using uniform forms, applications and disclosures as described below.

31. Consumers may receive a portion of their RAL loan on the same day as their taxes are prepared. This practice is called an "Instant Refund Anticipation Loan." The remainder of the funds (or all of the funds, if the consumer does not receive an "Instant" RAL) is issued as a "Classic Refund Anticipation Loan," which like a RAC entails the establishment of a dummy "Refund Deposit Account" at the banking entity.

32. The consumer receives the "Classic" RAL loan funds one or two days after his or her taxes are prepared and filed. When the consumer's tax refund is deposited into the account, the bank first disburses the funds to pay, among other things:

---

[10] National Consumer Law Center, *End of the Rapid Rip-Off, An Epilogue For Quickie Tax Loans* (2011) at 20.

    a. "Refund account fees" to itself, some of which also are received by Defendant, typically $29.95 (and an additional $13 if a state tax refund is directed to the Refund Deposit Account);

    b. What the bank terms the "finance charge";

    c. Any and all debts due to Defendant to pay for tax preparation services;

    d. The debt for the RAL; and

    e. Any and all other debts to HSBC including, for example, debts related to bank products sold to the consumer in previous tax years.

33. Any remaining funds are disbursed to the consumer either by check, by direct deposit to the consumer's personal bank account, or by a prepaid card option (called the H&R Block Emerald Card).

34. Like RACs, RALs also serve as loans for the deferral of tax preparation services. While Defendant for RALs (as opposed to RACs) provided "Truth in Lending Disclosure Statements," the quoted APR is based only on what the bank termed the finance charge, rather than the full finance charge which incorporates the bank fees for establishment of dummy accounts.

35. Named Plaintiff Anarosa Iglesias' experience for the 2008 tax year is exemplary. Ms. Iglesias had her 2008 taxes prepared at an H&R Block location on February 9, 2009. Ms. Igelsias' refund for that year totaled $1,843. Defendant provided Ms. Iglesias with an "Instant RAL" of $663 in the form of a prepaid debit card on the day her taxes were prepared. The remainder of the funds was applied to the same card 1-2 days later.

36.     While H&R Block qualified Ms. Iglesias for a $663 "Instant RAL," they deducted (from the amount "instantly" provided) the following: $271 for H&R Block's tax preparation fees, $30 in other services, $32.70 in what Defendant termed a "prepaid finance charge", and a $29.95 "Refund Account Fee." The remainder of Ms. Iglesias' "Instant RAL", $299.35, was given to her in the form of a prepaid H&R Block Emerald Card. The term of the loan was 12 days with payment due February 21, 2009.[11]

37.     The $29.95 Refund Account Fee was payment for the establishment of a one-transaction dummy account (Deposit Account) at HSBC, from which Defendant thereafter deposited the funds (less their fees and charges discussed above) onto the Emerald Card.

38.     In its "Truth in Lending Disclosure Statement," Defendant represented that Ms. Iglesias' amount financed was $630.30 with a $32.70 finance charge, which they calculated (with a loan term of 12 days) amounted to an APR of 157%. Thus Defendant included the amount available to Ms. Iglesias ($299.35), tax preparation fees ($271), other service fees ($30), *and* the Refund Account Fee ($29.95) in the principal amount.

39.     In the RALs marketed and facilitated by Defendant, Defendant misrepresented the finance charge by not including the Refund Account Fees (and where relevant the additional fee for state tax refunds) in the calculation of the finance charge, in violation of TILA and the FDUPTA. *See, e.g.*, U.S. F.D.I.C. Amended Notice of Charges for an Order to Cease and Desist, *In the Matter of Republic Bank & Trust Company, Louisville Kentucky*, dated May 3, 2011 at ¶

---

[11] Upon information and belief, H&R Block arbitrarily set loan terms such that additional fees were often charged to customers whose federal returns had not been received in the dummy account by the date the loan term expired. H&R Block further assessed its customers with the Emerald Card monthly maintenance fees, inactivity fees (fees for not using the card), transactional fees (fees for using the card), cash withdrawal fees, balance inquiry fees, "ATM denial" fees, customer service fees, over the counter withdraw fees, fees for exceeding the daily transactional limit (fees for using the card too often), statement fees, and additional fees.

11

34 ("By failing to disclose to taxpayers in the Assisted Refund transactions that the TRAF [Tax Refund Administration Fees] are finance charges for deferral of the tax preparation fees owed, the EROs [such as Defendant] have violated the written disclosure requirements under TILA on a nationwide basis in each Assisted Refund transaction").

40. Thus Defendant understated Ms. Iglesias' finance charges by $29.95 and understated the APR by not including the Refund Account Fee.

### Factual Allegations as to Plaintiff William Wimbley

41. Specifically, Defendant in 2008-2010 facilitated a RAC for Mr. Wimbley's 2007, 2008, and 2009 tax years.

42. Fees for Defendant's tax preparation services were $152, $306, and $154 in those three years, respectively.[12]

43. In each year, Defendant set up a Refund Deposit account to which the IRS deposited the tax refunds ($2,607, $1.053, and $2,234 in those three years, respectively).

44. In each year, Defendant deducted the tax preparation fee as well as a $29.95 refund account fee.

45. Defendant failed to provide any disclosures regarding the APR of these loans.

46. Upon information and belief and based upon the disclosures made by Defendant, Mr. Wimbley received the remaining funds via direct deposit into his account within 8 to 15 days of executing his tax return.

### Factual Allegations as to Plaintiff Ana Rosa Iglesias

47. Specifically, Defendant in 2009-2010 facilitated a RAL for Ms. Igesias' 2008 and 2009 tax years; and a RAC for the 2010 tax year.

---

[12] These are unconscionably high rates in and of itself for tax preparation services of this nature.

48. Fees for Defendant's tax preparation services were $271, $270, and $284.

49. In each year, Defendant set up a Refund Deposit account to which the IRS deposited the tax refunds ($1,843, $2,037, and $2,124 in those three years, respectively).

50. For 2008 and 2009, Defendant reported the APRs to be 157.801% and 134.506%, but the actual APRs were much higher when you correctly include the Refund Account Fee charged.

51. For 2008 and 2009, Defendant understated the finance charges by $29.95, the Refund Account Fee, in each year.

52. In 2010, Defendant charged Ms. Iglesias $32.95 in finance charges for an 8-15 day loan of $284.75, its tax preparation fee. Yet Defendant failed to disclose any APR related to this loan.

## CLASS ACTION ALLEGATIONS

### Class Definition

53. Pursuant to Federal Rule of Civil Procedure 23 and 15 U.S.C. § 1681b, Plaintiff brings this action for itself and on behalf of a class defined as:

> All natural persons residing in the State of Florida who after November 17, 2007 (a) received a refund anticipation check facilitated by Defendant and Defendant's tax preparation fees were deducted from the Refund Deposit Account established for the transaction, or (b) received a refund anticipation loan facilitated by Defendant.

54. Specifically excluded from the Class are: (a) all federal court judges who preside over this case and their spouses; (b) all persons who elect to exclude themselves from the Class; (c) all persons who have previously executed and delivered to Defendant releases of all their

claims for all of their Class claims; and (d) Defendant's employees, officers, directors, agents, and representatives and their family members.

### **Rule 23(a) Prerequisites**

55. **Numerosity.** The Class is so numerous that joinder of all members is impracticable. At this time, Plaintiffs do not know the exact size of the Class. Based on information and belief, the Class is comprised of at least thousands of members so as to render joinder of all Class Members impracticable.

56. **Commonality.** Common questions of law and fact predominate over individual issues. There is a well-defined community of interest in the questions of law and fact involved affecting members of the Class. The questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

> a. Whether Defendant calculated interest rates using the guidelines established under the federal Truth in Lending Act;
>
> b. Whether Defendant failed to abide by the written disclosure requirements of TILA as relates to interest rates;
>
> c. Whether violations of TILA constitute violations of FDUPTA;
>
> d. Whether Defendant disclosed to consumers for which it facilitated RACs or RALs the interest rate, calculated as required by TILA, and if not, whether such failure violated FDUPTA;
>
> e. Whether Defendant included the Refund Account Fee as part of the finance charge calculation if it disclosed the interest rate RACs or RALs it facilitated in Florida during the Class Period, and if not, whether such failure violated FDUPTA; and
>
> f. Whether Defendant provided any disclosure of the interest rate for RACs it facilitated to consumers in Florida during the Class Period, and if not, whether such failure violated FDUPTA.

57.     **Typicality.**  Plaintiffs' claims are typical of the other Class Members' claims.  As described above, Defendant uses common practices, applications, forms and disclosures in committing the conduct that Plaintiffs allege damaged them and the Class Members.  Defendant uniformly violated FDUPTA by engaging in the conduct as described above, and these violations had the same effect on each member of the Class.

58.     **Adequacy.**  Plaintiffs are adequate representatives of the Class because they fit within the class definition and their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs will prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs are represented by experienced and able attorneys.  Class counsel have litigated numerous class actions and complex cases, and Plaintiffs' counsel intend to prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs and class counsel can and will fairly and adequately protect the interests of all of the members of the Class.

## Rule 23(b) Prerequisites

59.     Questions of law and fact common to the Class predominate over questions affecting only individual Members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for the members of the Class to effectively redress the wrongs done to them on an individual basis.  Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts.

60. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

## CAUSES OF ACTION

**Violations of Florida's Deceptive and Unfair Trade Practices Law**

61. Plaintiffs incorporate by reference each of the foregoing allegations.

62. Plaintiffs and the Class are "consumers" within the meaning of Part II of Chapter 501, Florida Statutes, relating to Florida Deceptive and Unfair Trade Practices Act ("FDUPTA").

63. Pursuant to FDUPTA, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

64. Within four years prior to the filing of this complaint and continuing to the present, Defendant, in the course of trade and commerce, engaged in unconscionable, unfair, and/or deceptive acts or practices harming Plaintiffs and the Class, as described herein.

65. In addition to protecting individuals from unfair competition and/or deceptive trade practices, FDUPTA has an additional goal of making Florida's consumer protection and enforcement consistent with the established policies of federal law relating to consumer protection.

66. The federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1666j, and its implementing Regulation Z, 12 C.F.R. Part 226, are laws and regulations proscribing unfair, deceptive, or unconscionable acts or practices, and a violation thereof is a violation of FDUPTA.

67. Violations of TILA are determined on an objective standard, based on the representations in the relevant disclosure documents, with no necessity to establish the subjective misunderstanding or reliance of particular consumers.

68. Defendant is a creditor and Plaintiffs and Class Members are consumers for purposes of TILA.

69. Finance charges within the meaning of TILA include fees and amounts charged by third parties where the contracting party requires the use of a third party or where the creditor retains a portion of the third-party charge.

70. The Refund Account Fee charged to RAL and RAC recipients constitutes a "finance charge" within the meaning of TILA, 15 U.S.C. § 1605, and Regulation Z, 12 C.F.R. § 226.4.

71. Defendant failed to disclose to Plaintiffs and the Class an interest rate calculated utilizing the guidelines established under TILA by failing to consider the Refund Account Fee a finance charge.

72. For each RAC customer, Defendant failed to disclose any interest rate or finance charge, thus violating the written disclosure requirements of TILA.

73. For each RAL customer, Defendant failed to accurately disclose the interest rate, because it did not include the Refund Account Fee as part of the finance charge, which violates the written disclosure requirements of TILA.

17

74. By violating TILA, Defendant violated laws and regulations proscribing unfair, deceptive, or unconscionable acts or practices, therefore violating FDUPTA.

75. As a direct and proximate result of the aforementioned acts, Defendant unfairly and improperly received monies and continues to hold the monies belonging to Plaintiffs.

76. The harm to Plaintiffs outweighs the utility of Defendant's policies, acts and/or practices, and consequently Defendant's conduct herein constitutes an unlawful business act or practice within the meaning of FDUPTA.

77. The unfair, deceptive and/or fraudulent business practices of Defendant, as fully described herein, present a continuing threat to members of the public to be misled and/or deceived by Defendant's Refund Products as described herein.

78. As a direct and proximate result of Defendant's unfair and/or fraudulent conduct alleged herein, Plaintiffs and Class Members have lost money. Plaintiffs and members of the Class are direct victims of the Defendant's unlawful conduct, and each have suffered injury in fact, and have lost money and/or property as a result of Defendant's unfair and deceptive acts and practices.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment in favor of themselves and the Class for the following:

- a. That the Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure; that Plaintiffs are proper class representatives; and that the best practicable notice of this action be given to members of the Class represented by Plaintiffs;

b. That judgment be entered against Defendant and in favor of Plaintiffs and the Class on the Plaintiffs' FDUPTA claim, for actual and consequential damages, equitable relief, including restitution and restitutionary disgorgement.

c. That Defendant be permanently enjoined from its unfair, fraudulent, and deceitful activity.

d. That judgment be entered imposing interest on damages;

e. That judgment be entered imposing litigation costs and attorneys' fees under Plaintiffs' FDUPTA; and

f. For all other and further relief, including equitable relief, as this Court may deem necessary and appropriate.

**JURY TRIAL DEMANDED**

November 17, 2011                                       Respectfully submitted,

                                                        Brian T. Ku, Esq. (Fla. # 610461)
                                                        Louis I. Mussman, Esq. (Fla. # 597155)
                                                        M. Ryan Casey, Esq.
                                                        **KU & MUSSMAN, P.A.**
                                                        12550 Biscayne Blvd., Suite 406
                                                        Miami, Florida 33181
                                                        Tel: (305) 891-1322
                                                        Fax: (305) 891-4512
                                                        ryan@kumussman.com


Of Counsel:

Hank Bates
Randall K. Pulliam
Darrin L. Williams
**CARNEY WILLIAMS BATES**
   **PULLIAM & BOWMAN, PLLC**
11311 Arcade Drive, Suite 200
Little Rock, AR 72212

Tel: (501) 312-8500
Fax: (501) 312-8505
hbates@carneywilliams.com

Richard M. Golomb, Esq.
Ruben Honik, Esq.
Kenneth J. Grunfeld, Esq.
**GOLOMB & HONIK**
1515 Market St., #1100
Philadelphia, Pennsylvania 19102
Tel: (215) 985-9177
Fax: (215) 985-4169
kgrunfeld@golombhonik.com

BY: /s/ Brian T. Ku

*Counsel for Plaintiffs and Proposed Class*